**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CRYSTAL JOYE MINOR,**                    Case No. 5:18 CV 2233

     Plaintiff,

     v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                            MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Crystal Joye Minor ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms in part, and reverses and remands in part, the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in December 2015, alleging a disability onset date of May 31, 2010. (Tr. 176-77). Her claims were denied initially and upon reconsideration. (Tr. 81, 99). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 119-20). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 12, 2017. (Tr. 30-62). On February 14, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-23). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on September 27, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1978, Plaintiff was 31 years old on her alleged onset date, and 37 on her date last insured. *See* Tr. 176. She had past work as a home health aide and nursing assistant. *See* Tr. 22, 55-56.

Plaintiff lived alone, and her mother lived in the same trailer park. (Tr. 36-37). Plaintiff was able to drive and drove to the hearing. (Tr. 37-38). She was receiving Worker's Compensation and food stamps at the time of the hearing. (Tr. 38).

Plaintiff injured her back lifting a patient while working for hospice in 2009. (Tr. 39). She subsequently worked light duty for a year, but was then let go because she could no longer perform the job. (Tr. 43). Plaintiff believed she was unable to work due to her chronic pain, back and leg problems, and depression; she had difficulty sitting or standing for lengthy periods. *Id.* She could not do things she used to do like bowling. (Tr. 45). After her first surgery, Plaintiff felt better, but then fell and it set her back. (Tr. 48-49). She "tried everything" for her pain including aquatic therapy, physical therapy, acupuncture, and epidural injections. (Tr. 49). When those were unsuccessful, she had a trial spinal cord stimulator. *Id.* It "seemed to help a little bit", so she had a permanent stimulator placed. *Id.* But then it "got turned" and she could not charge it, so she returned to have it "turned" back. (Tr. 50).

Plaintiff received therapy and psychiatric treatment for her depression and anxiety. (Tr. 44). Counseling "help[ed] sometimes". *Id.* She watched television and was able to follow storylines, and "[f]or the most part" remember what happened week to week on a television show.

(Tr. 45-46). Plaintiff's mental state varied depending on what she was worried about, and her frustration with her physical condition. (Tr. 52-53). She had "a little hard time concentrating and focusing on certain things". (Tr. 53).

On a typical day, Plaintiff took medication, watched television or played games on her phone, showered, and got dressed. (Tr. 46). She stayed home unless she had a doctor's appointment; sometimes her mom visited and sometimes she took her mother to appointments. (Tr. 46-47). She ate lunch out with her mother about once per week. (Tr. 47). She was able to shower, dress herself, make simple meals, grocery shop (often with help), put groceries away, and do laundry. (Tr. 47-48). Plaintiff used a scooter at the grocery store, but not at smaller stores or if she only needed a few items. (Tr. 50).

Plaintiff estimated she could walk for about ten to fifteen minutes before needing to sit. (Tr. 51). During the hearing, she noted "[a] little bit" of pain in her hips after sitting for about 30 minutes. *Id.*

Relevant Medical Evidence

*Physical Health*

Plaintiff injured her back working as a home health aide in 2009 and was awarded Worker's Compensation benefits. *See* Tr. 1813. She was treated for L4-L5 and L5-S1 disc bulges, lumbar post-laminectomy syndrome, sacroiliitis, L4-L5 lumbar disc displacement, and L5-S1 radiculitis. *See id.* Records from chiropractor David Leone, D.C., at the Spine and Pain Institute in 2011 reveal Plaintiff reported a lumbar pain level ranging from five to eight out of ten, muscle cramps and weakness, as well as psychological symptoms. *See* Tr. 1039-40, 1045-52, 1057-1155. She underwent both chiropractic manipulation and acupuncture. *See id.* Dr. Leone's physical findings included: moderate generalized tenderness in the lumbar area, moderately restricted movement in

all directions, pain in all directions; he also observed decreased sensation in the dorsal aspect of the left foot and lateral aspect of the calf, as well as a positive straight leg raise on the left at 30 degrees. *See id.*

In 2011 and early 2012, Plaintiff saw Karen Hodakievic, CRNP, and Bina Behta, M.D., at the Spine and Pain Institute. *See* Tr. 979-1014, 1019-22, 1026-30, 1035-1038, 1041-1044, 1053-56. They noted examination findings of reduced mobility and range of motion, slow and antalgic gait, moderate generalized tenderness in the lumbar area, right lumbar stenosis, movement moderately restricted in all directions, decreased left lateral calf sensation as compared to the right, bilateral hyporeflexic reflexes, and negative straight leg raising tests. *See id.* Ms. Hodakievic and Dr. Behta refilled Plaintiff's pain medications. *See id.* In May 2012, Plaintiff reported her medications "take the edge off the pain and allow her to maintain her [activities of daily living]" and that her spine symptoms were improving. (Tr. 979).

An April 2011 EMG/nerve conduction study was "suggestive of a left S1 chronic active radiculopathy." (Tr. 1112). In August and September 2011, Plaintiff also underwent lumbar epidural steroid injections. *See* Tr. 1015-18; 1023-25; 1031-34.

A January 2013 lumbar spine MRI showed multilevel degenerative changes, most prominent at L5-S1 and L4-L5 showing moderate canal narrowing at L3-L4. (Tr. 1205).

A May 2014 MRI of Plaintiff's lumbar spine showed postsurgical changes at L5-S1, effacement of the left lateral recess and mass effect on the left ventral aspect of the thecal sac thought largely to be due to post-operative granulation tissue, as well as underlying residual or recurrent disc bulging suspected. (Tr. 380). It also revealed degenerative changes most pronounced at L5-S1 and L4-L5. (Tr. 380-81).

At a July 2014 visit with Ms. Hodakievic, Plaintiff reported her lumbar spine pain was moderate, constant, and stable. (Tr. 1400). It radiated to her left leg (causing numbness, spasms, and tingling), and was aggravated by walking and standing. *Id.* Her medications took the edge off her pain, and allowed her to perform her activities of daily living. *Id.* On examination, Ms. Hodakievic observed Plaintiff had an antalgic gait, and normal paraspinous and lower extremity muscle tone with no spasm. (Tr. 1403). She had tenderness to palpation in her bilateral gluteal, paraspinous, and lumbar regions. *Id.* She had limited lumbar range of motion with pain, and her left knee, ankle, and foot strength was limited. (Tr. 1403-04). Straight leg raising caused "back pain only" bilaterally. (Tr. 1403). Plaintiff had some reduced reflexes in her patella and Achilles, and decreased sensation at right S1 and left L5 and S1. (Tr. 1404). Dr. Mehta and Ms. Hodakievic noted similar findings through 2014 and 2015. *See* Tr. 1407-77, 1487-98, 1504-21.

In December 2014, Krishna Satyan, M.D., wrote a letter stating Plaintiff's symptoms and MRI findings were related to her original work injury. (Tr. 373). She noted symptoms of moderate to severe low back and left leg pain, with numbness and tingling in the left foot. *Id.*

A January 2015 CT scan of Plaintiff's lumbar spine showed multilevel lumbar degenerative disc disease and probable central canal stenosis at multiple levels. (Tr. 365). It also revealed probable right neural foraminal narrowing at L4-L5 and possible right neural foraminal narrowing at L3-L4. *Id.*

In February 2015, Plaintiff underwent a hemilaminotomy for recurrent disc displacement and a left-sided hemilaminotomy for microdiscectomy. (Tr. 344-45). In March 2015, Plaintiff started physical therapy. (Tr. 279). She reported waking due to pain, difficulty washing, dressing, and putting on shoes; she was unable to do laundry, cooking, or cleaning. *Id.* On examination, the physical therapist observed some lower extremity reduced muscle strength, poor body mechanics,

and a moderate postural shift to the left (Tr. 280); he recommended six weeks of physical therapy (Tr. 282). He noted Plaintiff's examination was "consistent with [left] postlateral derangement of the lumbar spine and recent surgery of the [low back]." *Id.* Plaintiff continued physical therapy through July 2014. *See* Tr. 284-95. In July, she had made "excellent progress" toward several of her therapeutic goals, but no change in her goal regarding pain. *See* Tr. 284-85.

In September 2015, Plaintiff saw John Butler, M.D., complaining of mild to moderate back pain radiating to the left leg and foot; she described "jolts" in her left foot. (Tr. 495). On examination, Dr. Butler found Plaintiff had an antalgic gait, a normal straight leg raise, some reduced strength in her left lower extremity, and pain with knee flexion and extension. (Tr. 496). He assessed improved radiculitis and renewed medications. (Tr. 497).

In April 2016, after her date last insured[1], Plaintiff saw Ms. Hodakievic. (Tr. 953). She reported improvement with prednisone, but continued lumbar and leg pain. *Id.* On examination, she had decreased range of motion, pain, and spasm in her lumbar spine; she also had an abnormal gait and an abnormal straight leg raise test. (Tr. 955).

Plaintiff also underwent additional physical therapy in 2016. (Tr. 1548-1608). The July 2016 discharge summary notes Plaintiff was able to cook for about fifteen minutes with pain in

---

1. In order to qualify for an award of DIB, a claimant must establish the onset of disability prior to the expiration of her insured status. *See Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984). Thus, to be entitled to DIB, Plaintiff must establish that she became disabled prior to December 31, 2015, her date last insured. Post-insured status evidence of new developments in a claimant's condition is generally not relevant. *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981). Such evidence may be examined, however, when it establishes that the impairment existed continuously and in the same degree from the date a claimant's insured status terminated. *See King v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration evidence may be considered, but it must relate back to a claimant's condition prior to the expiration of date last insured).

her lower back and hips, had difficulty vacuuming, was able to grocery shop with a scooter, and able to carry some groceries. (Tr. 1548). On examination, Plaintiff had some reduced muscle strength in her lower extremities (improved since May), and some reduced range of motion in her lumbosacral spine (also improved since May). (Tr. 1549). Plaintiff was noted to have made "some" to "good" progress on her therapy goals, but was discharged from therapy due to a plateau in progress. (Tr. 1550-51); *see also* Tr. 1549 ("Client appears to have reached a plateau at this time until her L knee condition is resolved.").

In September 2016, Plaintiff saw Todd Hochman, M.D., after being discharged from Dr. Mehta's practice. (Tr. 1725). She reported back pain associated with numbness and tingling in the hips and lower extremities, worse on the left, and knee pain. *Id.* On examination, Plaintiff was in moderate discomfort, had some flattening of the normal lumbar lordosis, midline discomfort, paraspinal muscle spasm and pain, and pain with straight leg raising. (Tr. 1726). She had some weakness in the left ankle and a diminished patellar reflex on the left. *Id.* Dr. Hochman prescribed Topamax and referred Plaintiff to pain management. (Tr. 1727).

At a follow up appointment with Dr. Hochman in April 2017, Plaintiff was "at her wits end" and "extremely frustrated." (Tr. 1719). She reported her medications helped with the pain, but she wanted to pursue something to get off medication. *Id.* Dr. Hochman noted Plaintiff's pain management physician recommended a spinal cord stimulator trial. *Id.* On examination, Plaintiff was in moderate discomfort; she had spasm and trigger points, discomfort with a straight leg raise (greater on the left), and weakness. *Id.* Dr. Hochman opined, for purposes of Worker's Compensation, that Plaintiff had not yet reached maximum medical improvement and should be authorized for the stimulator trial. (Tr. 1720). Plaintiff had similar physical findings, including an antalgic gait, in June. (Tr. 1717).

Plaintiff had a trial spinal cord stimulator implanted in her back in June 2017, and subsequently a permanent stimulator implanted in August. *See* Tr. 1785, 1800, 1813. In September 2017, Dr. Hochman noted Plaintiff had moderate discomfort, some tenderness in the lumbar region, weakness, and pain with straight leg raising on the left. *Id.*

### Opinion Evidence

In February 2016, State agency physician Esberdado Villanueva, M.D., reviewed Plaintiff's records, and opined Plaintiff could perform the lifting requirements of light work (20 pounds occasionally and 10 pounds frequently), stand or walk for four hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. 75). He opined Plaintiff had some postural restrictions, and should avoid all exposure to hazards. (Tr. 75-76).

In May 2016, State agency physician Bradley Lewis, M.D., reviewed Plaintiff's records and offered a similar opinion with slightly greater postural restrictions. (Tr. 91-93).

### Mental Health

In February 2011, Plaintiff saw Milli Wilcoxson, Ph.D., for an initial evaluation. (Tr. 555-60). Plaintiff reported finding it hard to do ordinary tasks, constant worrying, and feeling bad about relying on her mother for help. (Tr. 556). She reported many days when she did not get dressed and stayed in bed or on the couch. *Id.* Dr. Wilcoxson noted Plaintiff's Beck Depression Inventory II ("BDI-II") score was 38, reflecting a "moderate to severe degree" of symptoms. *Id.* Her Patient Health Questionnaire ("PHQ") score was indicative of severe major depression. *Id.* She diagnosed major depressive disorder, single episode, moderate, and pain disorder with both psychological factors and a medical condition; she noted these were related to Plaintiff's work injury. (Tr. 557). Dr. Wilcoxson recommended ten to twenty months of cognitive behavioral therapy, as well as a psychiatric consult to assess for possible psychotropic medication. (Tr. 558).

From 2011 through 2015, Plaintiff treated with psychiatrist Bharat Shah, M.D., and nurse practitioner, Donna Laughlin, CNS, for medication management related to her depression and anxiety. (Tr. 563-600). Medications included Lorazepam, Venlafaxine, Oxcarbazepine, Effexor, Trazodone, Celexa., and Buspirone *See id.* She was frequently noted to be stable, *see id.*, and at times, "stable, but frustrated with her situation", *see, e.g.*, Tr. 575.

Plaintiff saw Dr. Wilcoxson from August 2011 through April 2012. *See* Tr. 539-54. At these visits, Dr. Wilcoxson consistently observed Plaintiff's mental status and cognitive/perceptual status to be within normal limits. *See id.* During these sessions, Plaintiff discussed her pain and worries about the future. *See id.* Each time, Dr. Wilcoxson noted symptoms of depression and anxiety; she also sometimes noted sleep disturbance. *See id.* She also noted improvements in Plaintiff's mood at times, and assessed her prognosis each time as "fair". *Id.*

At an evaluation for psychological stability to undergo a surgical procedure in June 2014, Dr. Wilcoxson noted Plaintiff's mental status was within normal limits and she scored a 21 on the BDI-II, in the "moderate" range, and lower than her initial evaluation. (Tr. 531). Dr. Wilcoxson noted improvement in symptoms such as sadness, loss of pleasure, loss of interest, and frequency of crying; Plaintiff continued to struggle with symptoms loss of self-worth, sleep and appetite disturbance, and fatigue. *Id.*

In a letter from October 2015, Dr. Wilcoxson summarized Plaintiff's treatment from May 2012 through December 2014. (Tr. 529). She noted Plaintiff's affect had been consistently depressed and she appeared hopeless regarding physical improvement. *Id.*

Notes from Dr. Wilcoxson in January 2015 indicate Plaintiff's mental status and cognitive/perceptual status were within normal limits. (Tr. 538). She had symptoms of depression, anxiety, and fatigue and reported feeling hopeless at times. *Id.* Dr. Wilcoxson assessed her

prognosis as fair. *Id.* Treatment records from February through May 2015 have similar findings, with some additional symptoms such as apathy, sleep disturbance, and appetite disturbance. *See* Tr. 532-37. In November 2015, Plaintiff reported feeling overwhelmed, with a few episodes of "uncontrollable crying." (Tr. 643). Dr. Wilcoxson continued to note symptoms of depression, anxiety, fatigue, and sleep disturbance. *Id.*

Late 2017 treatment notes (again, after Plaintiff's date last insured) from Dr. Wilcoxson again indicate mental status and cognitive/perceptual status as within normal limits. *See* Tr. 1814-16. They again reveal symptoms of depression, anxiety, fatigue, and sleep disturbance and Plaintiff's frustration with her lack of physical improvement. *See id.*

### Opinion Evidence

Dr. Wilcoxson completed a mental status questionnaire in January 2016. (Tr. 653-55). In it, she indicated Plaintiff's mood and affect were depressed and anxious and that Plaintiff currently had "mild" symptoms of anxiety. (Tr. 653). Plaintiff's cognitive functioning, appearance, speech, and orientation, insight and judgment were within normal limits. *Id.* Dr. Wilcoxson cited diagnoses of major depression and pain disorder with mixed symptoms. (Tr. 654). She opined Plaintiff could follow simple directions within normal limits "but slow", and "complex would be difficult." *Id.* Regarding ability to sustain concentration and persist at tasks, Dr. Wilcoxson noted Plaintiff had decreased concentration, lost focus, and it was difficult for her to complete tasks. *Id.* She opined Plaintiff would lose patience and be irritable in social interactions, and had a compromised ability to handle stress; Plaintiff would not handle changes in routine well. *Id.*

In February 2016, State agency physician Joseph Edwards, Ph.D., reviewed Plaintiff's records and offered an opinion regarding her mental residual functional capacity. (Tr. 77-78). He opined Plaintiff was moderately limited in her ability to carry out detailed instructions and

maintain attention and concentration for extended periods; she would also be moderately limited in "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 77). Specifically, he summarized that she could "carry out moderately complex tasks in settings without strict time or production demands. *Id.* Dr. Edwards also opined Plaintiff was moderately limited in her ability to interact appropriately with the general public, but not significantly limited in her ability to respond to supervisors or get along with supervisors; he noted specifically that she could "maintain brief conventional relations with others." (Tr. 77-78). Finally, he opined Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, specifically stating that "[m]ajor changes should be explained in advance." (Tr. 78).

In May 2016, State agency Physician Denise Rabold, Ph.D./M.A., affirmed Dr. Edwards's opinion. (Tr. 94-95).

<u>VE Testimony</u>

A VE appeared and testified at the hearing before the ALJ. (Tr. 54-60). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 56). The VE responded that such an individual could not perform Plaintiff's past work, but could perform jobs such as table worker, final assembler, and bonder. (Tr. 56-57). The VE stated that these jobs "are very simple jobs that are taught and learned from just a simple demonstration that might take . . . one or two minutes." (Tr. 60). The VE also testified that if such an individual was absent from work three days per month, she would not be able to sustain competitive employment. (Tr. 57). In response to questions from Plaintiff's counsel, the VE stated that adding limitations that the

individual be able to sit or stand at will, not perform overhead work, or avoid uneven surfaces would still allow for the identified jobs. (Tr. 58). The VE stated that requiring redirection to work tasks once or twice per day would be acceptable, but three times would be problematic. (Tr. 58-59). Further, adding a limitation that an individual need to lie down or rest at unpredictable intervals would preclude employment. (Tr. 60).

ALJ Decision

In her February 14, 2018 written decision, the ALJ found Plaintiff last met the insured status requirements for DIB on December 31, 2015 and had not engaged in substantial gainful activity from her alleged onset date (May 31, 2010) through her date last insured. (Tr. 17). She determined Plaintiff had severe impairments of lumbar degenerative disc disease, post-laminectomy and discectomy; scoliosis; obesity; depressive and anxiety disorders; and a torn meniscus of the left knee; none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then set forth Plaintiff's RFC through her date last insured:

> [T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never work at unprotected heights or around moving mechanical parts; limited to performing simple, routine and repetitive tasks but not a[t] production rate pace; occasional interaction with co-workers, supervisors and the public; and limited to tolerating few changes in a routine work setting.

(Tr. 19). The ALJ found Plaintiff was unable to perform her past relevant work as a home health aide or nursing assistant, but given her age, education, and work experience, there were other jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (Tr. 22). Therefore, the ALJ found Plaintiff not disabled from May 31, 2010, her alleged onset date, through December 31, 2015, her date last insured. (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

    1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises two challenges to the ALJ's decision. First, she argues the ALJ erred in assigning significant weight to state agency physician Dr. Edwards's opinion without adopting all limitations therein, or explaining the failure to adopt them. Second, she argues the ALJ's credibility analysis is not supported by substantial evidence. For the reasons discussed below, the undersigned finds no error in the ALJ's evaluation of Dr. Edwards's opinion, but reverses and remands for an explained credibility/subjective symptom evaluation.

Mental RFC / Dr. Edwards

Plaintiff first argues the ALJ's mental RFC is not supported by substantial evidence

because "she failed to reconcile the opinion of Dr. Edwards with the RFC determination." (Doc. 13, at 3). Specifically, she contends the ALJ erred in failing to explain why she rejected Dr. Edwards's opinion that Plaintiff would be moderately limited in her ability to complete a normal workday and workweek without psychologically based symptoms, despite assigning significant weight to that opinion. *See id.* at 14-18.

An ALJ is to consider certain regulatory factors in evaluating opinion evidence from a medical source. *See* 20 C.F.R. § 404.1527(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. *Id.* While "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

Notably, unlike for a treating physician, an ALJ need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only treating sources."). ALJs are not required to defer to such opinions of non-treating sources and must only provide a meaningful explanation regarding the weight given to particular medical source opinions. *See* SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and

psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."). Finally, SSR 96-8p explains that the "RFC assessment must always consider and address medical source opinions" and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." 1996 WL 374184, at *7.

In considering the State agency mental health opinions, the ALJ explained:

> Lastly, the undersigned affords significant weight to the State Agency opinion regarding the claimant's mental residual functional capacity, again, it is consistent with the overall record, which shows issues with major depression but that the claimant performs a wide range of activities of daily living—simple and complex tasks. She has difficulty withstanding stress, but manages to care for her medical needs and her workers' compensation case without difficulty.

(Tr. 22).

The Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion. For example, in *Martin*, the plaintiff challenged an ALJ's failure to either include – or explain his omission of – certain opined restrictions from a State agency reviewing physician and a one-time consultative examiner in an RFC. 658 F. App'x at 258 ("Martin also argues that the ALJ failed to explain why certain aspects of two opinions by non-treating sources were omitted from his RFC."). The Sixth Circuit found no error:

> Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions. *See Smith*, 482 F.3d at 876 ("[T]he SSA requires ALJs to give reasons for only *treating* sources."); *see also Reeves v. Comm'r of Soc. Sec.*, 618 Fed.Appx. 267, 273 (6th Cir. 2015) (same).

*Id.* at 259; *see also Ellsworth v. Comm'r of Soc. Sec.*, 2016 WL 11260325, at *12 (N.D. Ohio) ("This court has frequently denied remand on this issue and confirmed that there is no legal requirement for an ALJ to explain or adopt every limitation or restriction opined by a state agency nonexamining physician, even when the ALJ has given the opinion 'great' or 'significant' weight.") (collecting cases), *report and recommendation adopted*, 2017 WL 2857619.

In the instant case, the undersigned first observes that while Plaintiff contends the cited restriction – moderate difficulties in completing a normal workday or workweek without interruptions from psychologically based symptoms – contradicts the RFC, it is not clear that Dr. Edwards believed or intended it to be so. That is, Dr. Edwards answered a series of questions about Plaintiff's "sustained concentration and persistence limitations", including the cited question. (Tr. 77). Then, in response to a question that he "[e]xplain in narrative form the sustained concentration and persistence capabilities and/or limitations", he wrote:

> Simple directions WNL, but slow. Complicated would be difficult. Maintain attention: not able to sustain; Sustains concentration, persist at task; Loses focus, errors in se[rial] 7's. Social interaction: minimal social support, loses patience, unreliable. *Can carry out moderately complex tasks in settings without strict time of production demands.*

*Id.* (emphasis added). The ALJ in the instant case limited Plaintiff to "simple, routine and repetitive tasks but not at production rate pace" and "limited to tolerating few changes in a routine work setting" (Tr. 19), which appears to reasonably accommodate Dr. Edwards's narrative description of Plaintiff's concentration and persistence limitations. Moreover, having "moderate difficulties" in completing a workday or workweek is not the same as saying Plaintiff would be *unable* to do so. Rather, it means Plaintiff would have some difficulty, but such a difficulty may be accommodated by imposing restrictions on her work, such as Dr. Edwards opined (Tr. 77) ("Can

carry out moderately complex tasks in settings without strict time or production demands"), and the ALJ imposed (Tr. 19).

Plaintiff cites the VE's testimony that if a person were absent from work three days per month, she would be unable to maintain competitive employment (Tr. 57), and that it would be a problem if an employee needed redirection three times in an eight-hour workday (Tr. 58), arguing "Dr. Edwards' opinion *could* support similar limitations in an RFC, however, the ALJ made no findings regarding this, and appears to have disregarded the specific limitation." (Doc. 13, at 17) (emphasis added). However, Plaintiff cites no legal authority for the position that a "moderate" impairment in this area *necessarily* results in such restrictions, or that such a limitation is not accommodated by the proffered RFC. The undersigned finds that the ALJ reasonably accommodated Dr. Edwards' restrictions into the RFC and that decision is supported by substantial evidence. To the extent there is a contradiction in the record between Dr. Edwards's opinion that Plaintiff would have a moderate limitation in completing a normal workday or workweek and his narrative statement that Plaintiff could "carry out moderately complex tasks in settings without strict time or production demands", such a conflict is for the ALJ to resolve in the first instance, and the ALJ did so reasonably here. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) ("We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence."); *Jones*, 336 F.3d at 477 (even if substantial evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ").

Subjective Symptom Analysis

Secondly, Plaintiff argues the ALJ erred in her failure to explain the credibility / subjective symptom analysis. Specifically, she contends the ALJ merely provided boilerplate statements

regarding the credibility of her testimony and further "fail[ed] to give any explanation throughout the rest of her decision which would be construed as an explanation of her credibility finding." (Doc. 13, at 19). In response, the Commissioner points to other portions of the ALJ's decision and explains how they support the ALJ's credibility determination. The undersigned agrees with Plaintiff's Reply argument that the Commissioner's analysis is impermissible *post hoc* reasoning and the ALJ's decision does not contain an adequate credibility analysis. As such, this matter will be reversed and remanded.

The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800–01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

When a claimant alleges impairment-related symptoms, an ALJ must follow a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, *2-8.[2]

---

2. SSR 16-3p replaced SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. It directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms" and removes the term "credibility". *Id.* at *1. Both rulings, however, refer to the same two-step process articulated in 20 C.F.R. § 404.1529 and the same factors to consider. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113,

First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). Although the ALJ must "consider" the listed factors, there is no requirement that she discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained (interpreting SSR 96-7p, the precursor ruling), that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such determinations are "virtually unchallengeable", *Ritchie v.*

_____

119 n.1 (6th Cir. 2016) (noting that the updated ruling was to "clarify that the subjective symptoms evaluation is not an examination of an individual's character.") (internal quotation omitted). Thus, "[w]hile the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where the usage of the term is most logical." *Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio ), *report and recommendation adopted*, 2018 WL 309369.

*Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.].""). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ here set forth the two-step process, and then summarized Plaintiff's testimony regarding her symptoms as follows:

> [T]he claimant testified that her wors[t] problem is her chronic pain, leg pain, anxiety, and depression. She cannot stand or sit for long periods. She receives treatment for her severe impairments and takes medication. Her psychotherapy helps some but she forces herself to socialize. She had two back operations but still has chronic back pain.

(Tr. 20). The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

*Id.* The remainder of the ALJ's decision summarizes Plaintiff's medical records and medical opinion evidence, as well as describing the weight assigned to each opinion. *See* Tr. 20-22. At the end of the ALJ's RFC analysis, she states: "[i]n sum, the above [RFC] is supported by an independent review of the overall record; as it is consistent with the record, it is therefore justified." (Tr. 22).

The Commissioner argues the ALJ "appropriately considered the record as a whole, including objective medical evidence, the opinion evidence, Plaintiff's treatment history, and Plaintiff's activities of daily living, in assessing Plaintiff's statements regarding her limitations stemming from her mental and physical impairments." (Doc. 16, at 5). But the subsequent analysis provided by the Commissioner, *id.* at 6-8, is largely *post hoc* analysis and was not offered by the ALJ, and that this Court cannot accept. *Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency). Although the Commissioner correctly notes the ALJ discussed findings from records that Plaintiff had decreased leg pain at times, some normal findings on examinations, and described various daily activities, *see* Tr. 20-21, the ALJ did not connect any of this discussion to her credibility analysis.

In *Cox v. Commissioner of Social Security*, the Sixth Circuit explained that other Circuit Courts have criticized boilerplate credibility findings, "finding the language unhelpful". 615 F. App'x 254, 260 (6th Cir. 2015). The Sixth Circuit's "chief concern with the popularity of this template, however, is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Id.* (emphasis in original). Such boilerplate language "explains the extent to which the ALJ discredited Appellant's testimony, but not her reasons for doing so." *Id.* The *Cox* court, however, stopped short, of finding the use of the boilerplate language reversible in and of itself; rather, it explained that it is only when the ALJ substitutes the boilerplate for an explanation of the credibility finding and fails to explain her reasons for the credibility determination that use of the boilerplate constitutes error. *Id.* The ALJ committed that error here.

As another district court explained:

> Although the ALJ was under no obligation to accept [the plaintiff's] testimony as credible, he was obligated to provide reasons for his credibility finding that are sufficiently specific to allow subsequent reviewer, such as this Court, to understand the result. Here, the ALJ did not discuss any of the seven factors set forth in SSR 96-7p. While the ALJ mentioned some of [the plaintiff's] daily activities, he fails to explain how these activities either support or detract from her credibility.

*Romig v. Astrue*, 2013 WL 1124669, at *6 (N.D. Ohio); *see also Knight v. Comm'r of Soc. Sec.*, 2015 WL 5916181, at *4 (E.D. Mich.) (finding ALJ's statements that "[t]he objective medical evidence does not fully corroborate the claimant's testimony regarding the extent of her limitations" and that claimant was not credible "for the reasons explained in this decision" insufficient when the ALJ "does not set forth those reasons."), *report and recommendation adopted*, 2015 WL 5877811.

Even if the Commissioner's *post*-hoc rationale is correct and ALJ's decision is ultimately supported by substantial evidence, his decision is not sufficiently specific to make clear the reasons he discounted Plaintiff's testimony. *See* SSR 16-3p, 2017 WL 5180304, at *10 (ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").[3] Remand is thus required.

---

3. This error is more pronounced with regard to Plaintiff's physical symptoms than it is with regard to her mental symptoms. This is so because at Step Three, the ALJ directly compared and contrasted Plaintiff's mental health allegations with her activities, suggesting a basis for her analysis of Plaintiff's mental health symptoms. *See* Tr. 18-19. She offered no such analysis regarding Plaintiff's physical symptom allegations as compared to the record. However, because remand is required, the undersigned instructs the ALJ to set forth a clear basis for her evaluation of Plaintiff's subjective symptoms – both mental and physical.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses and remands that decision for a new subjective symptom evaluation and explanation thereof.


 s/ James R. Knepp II
United States Magistrate Judge